# IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF HAWAI'I

| | |
|---|---|
| SYNAGRO TECHNOLOGIES, INC., | CIVIL NO. CV044-00509 (SPK/LEK) |
| Plaintiff, | DECLARATION OF WAGDY A. GUIRGUIS; EXHIIBITS "4," "5," "6" & "7" |
| vs. | |
| GMP HAWAI'I, INC., | |
| Defendants. | |

## DECLARATION OF WAGDY A. GUIRGUIS

1. I, WAGDY A. GUIRGUIS, declare that this Declaration is provided upon personal information and belief and is true to the best of my knowledge.

2. I am the President of GMP HAWAI`I, INC. ("GMP"), a Hawai`i Corporation.

3. I am a licensed professional engineer.

4. I have personal knowledge regarding the facts stated herein and am competent to testify regarding the same.

5. As set forth in the Declaration of Peter B. Melynk filed on November 25, 2005 in support of GMP's opposition to the motion for summary judgment brought by Synagro Technogies, Inc. ("Synagro"), the claims asserted by GMP in this action were based on the agreement of Synagro that, as a member of the Project Delivery Team, GMP would provide the following services in the event that the joint efforts of the team succeeded in Synagro obtaining a contract with the City and County of Honolulu ("City") to design and construct the In-vessel Bioconversion Facility at the Sand Island Wastewater Treatment Plant in Honolulu (the "Project"): (1) Environmental Assessment & Permitting; (2) Engineering Design including architectural, civil, electrical, mechanical, and structural; and (3) Construction Management.  (*See,* paragraphs 9, 10 and 18 of the Melynk

November 25, 2005 Declaration, a true and correct copy of which is attached hereto as Exhibit "6.")

6.  At the request of Synagro, GMP prepared and submitted engineering fee proposals and construction management proposals for work that Synagro had agreed would be performed by GMP. As directed by Synagro, GMP submitted those proposals to the company that it understood would be the Project Manager, Andritz-Ruthner, Inc. ("Andritz"), for use in preparing and submitting to the City cost proposal from Synagro for the entire contract to design and construct the Project. (*See*, paragraphs 14 and 19 of the Melnyk Declaration, Ex. 6). Attached as Exhibit "4" is a true and correct copy of the proposal dated June 1, 2001 that GMP submitted to Andritz for that purpose. As set forth therein, GMP proposed separate amounts for design services relating to the site work for the Project, to design of the anaerobic digester, to design of the sludge drying building, and for construction management services.

7.  Subsequent to submission of GMP's proposal, Synagro divided the Project into two parts by giving a contract to Andritz to design and build the portion of the Project that involves the dryers and related systems and a contract to CBI Walker Services, Inc. ("CBI") to design and build the biodigester portion of the Project. (*See*, paragraphs 20 and 21 of the Melnyk Declaration, Ex. 6.)

8. Thereafter, GMP entered into a subcontract with Andritz to provide all of the architectural, civil, electrical, mechanical and structural engineering services required for that portion of the Sand Island Bioconversion Facility that involves the dryers and related systems, as contracted to Andritz by Synagro. Pursuant to that subcontract, GMP has performed all of the design services that it expected to perform for that portion of the Project based on Synagro's agreement, as set forth is paragraph 5 above, relating to the scope of work that GMP would perform for the Project. (*See,* paragraph 24 of the Melnyk Declaration, Ex. 6.)

9. Thereafter, GMP also entered into a subcontract with CBI to perform the civil engineering services required for the biosolids digester portion of the Project but that contract did not include the architectural, civil, electrical, mechanical or structural engineering services required for that portion of the Project which, as set forth in paragraph 5 above, Synagro had agreed would be included in GMP's scope of work. (*See,* paragraph 25 of the Melnyk Declaration, Ex. 6.) Nor did GMP receive a contract to perform any of the construction management services for the Project that, as set forth in paragraph 5 above, Synagro had agreed would be performed by GMP. (*See,* paragraph 26 of the Melnyk Declaration, Ex. 6.)

10. Not having received a contract or promise of a contract from CBI or from Synagro for the architectural, civil, electrical, mechanical or structural

engineering services required for the biosolids digester portion of the Project or for construction management services for the entire Project, GMP communicated by email with Synagro regarding those missing design and construction management services. Attached as Exhibit "5" is a true a correct copy of a July 26, 2002 e-mail from GMP that was sent on Peter Melnyk's instruction to James Hecht of Synagro reconfirming the proposed engineering fees for the sludge drying building in the amount of $254,469 and for construction management services in the total amount of $696,231. As comparison with Exhibit "4" indicates, the engineering and construction management fees set forth in Exhibit "5," the services for which GMP did not receive the contract it expected to receive based on its agreement with Synagro, are a portion of the total fees proposed by GMP, as set forth in Exhibit "4," prior to GMP obtaining the subcontracts from Andritz and CBI for a portion of those services as discussed above.

11.   Count I of the Counterclaim filed by GMP in this action asserts a claim for Breach of Implied Contract. In making the allegations relating to that claim, the Counterclaim alternately refers to both the contract that Synagro obtained from the City to design and construct the entire In-vessel Bioconversion Facility and to the implied contract between Synagro and GMP to provide engineering and construction management services for the Project.   *See,*

paragraphs 1 through 7 generally and 2, 3, 6 and 7 specifically for the allegations relating to the contract between Synagro and the City.

12.  In its Motion, Synagro erroneously contends that the amounts that GMP sought to recover through Count I of the Counterclaim are the $2,683,422.00 stated for design services in paragraph 12 of the Counterclaim and the $846,000.00 stated for construction management services in paragraph 13 of the Counterclaim. Synagro has misread those paragraphs as relating to the amount of the implied contract when they are, in fact, the amounts stated for design services and construction management in the contract between Synagro and the City for the entire Project. In fact, those amounts were taken directly from Change Order No. 1 to the Synagro's contract with the City that is attached as Exhibit "J" to Synagro's Renewed and Supplemental Motion for Summary Judgment filed on September 2, 2004. The $846,000.00 amount stated in Change Order No. 1 for construction management is generally related to the $696,231.00 proposed by GMP for construction management (*see,* Exhibits "4" and "5"), such that it could be reasonably assumed that the $846,000.00 consists of the $696,231.00 GMP proposed for those services plus a markup of some type added by Synagro, but the $2,683,422.00 stated for design services is wholly unrelated to and greatly exceeds the amounts that GMP proposed for all of the design services Synagro had agreed GMP would perform for the Project (*see,* Exhibit "4"). Nor does GMP have any



information as to what other services Synagro included in the design services for which $2,683,422.00 was included in the contract between Synagro and the City.

13.    The services for which GMP alleged it had an implied contract with Synagro are the services that Synagro had agreed GMP would perform but which were not included in the subcontracts for design services that GMP obtained from Andritz and CBI; specifically, the architectural, civil, electrical, mechanical or structural engineering services required for the biosolids digester portion of the Project and the construction management services for the entire Project. As set forth in Exhibit "5," the amounts that GMP proposed for those services was $254,469.00 for the design services for the biosolids digester and $696,231.00 ($427,691.00 + $108,863.00 + $159,677.00) for construction management services. The total of those two amounts is $950,700.00, far less than the $3,529,422.00 ($2,683,422.00 + $846,000.00) total that Synagro erroneously contends is the amount of the implied contract that GMP sought to enforce via Count I of the Counterclaim.

14.    The amount that GMP sought to recover via Count I of its Counterclaim was not the $950,700.00 total it had proposed for the services that it was not permitted to perform, but merely the profits that it expected to derive from the implied contract *(see,* paragraph 14 of the Counterclaim). Since GMP did not perform any of the services for which those amounts were proposed, it is my

28130/2/429941                                                7

understanding that any recovery on GMP's implied contract claim would be limited to the profits that GMP would have derived had it received a contract to provide those services and would not include the costs that GMP would have incurred (including the salaries plus burden for the persons who actually perform the work) to perform those services.

15.     The industry standard for profits on contracts with governmental agencies for design and construction management services of the same nature as the implied contract asserted in Count I of the Counterclaim is 10%.  When negotiating contract amounts and approving increases or decreases in the amount of contracts for design and construction management services, the City and other governmental agencies in Hawaii routinely use 10% as the allowable mark up for profit and generally reject higher markups for profit.  Attached as Exhibit "7" is a true and correct copy of the Weighted Profit Guidelines for determining the rate of profit allowable under the Federal Acquisition Regulations, FAR 15.404-4, which Guidelines unambiguously state that "A/E [Architect/Engineer] contracts will normally be weighted from .07 (low) to .15 (high)."  The Guidelines also state that work between $500,000 and $1,000,000 shall be weighted from .09 to .07 (*see*, Exhibit "7").  In addition, it is a standard practice of GMP to utilize 10% for profit when negotiating contracts for services of the same nature as the implied contract

asserted in Count I of the Counterclaim; in fact, most of GMP's clients rarely allow GMP to utilize a rate for profit in excess of 10%.

16.  The maximum amount of an award of profits for the implied contract asserted in Count I of the Counterclaim based on that industry standard is $95,070.00, i.e. 10% of the $950,700.00 GMP had proposed for the design and construction management services that Synagro agreed would be included within the scope of its work but which it was not given contracts to perform.

17.  Synagro filed the Complaint in this action on August 18, 2004, five days after Andritz had filed a separate action in this Court on August 13, 2004, Civil No. 04-00497. GMP was served with the Complaint in the Andritz action on August 16, 2004 and, just 11 days thereafter, reached an agreement with Andritz for settlement of all claims, the terms of which settlement were placed on the record with this Court on August 27, 2004. Due to some continuing obligations between the parties, the Stipulation for Dismissal With Prejudice was not filed until nearly one year later on August 12, 2005, but the Andritz action was fully resolved as of August 27, 2004 as the Court's record of that action should confirm. Synagro was not a party to the action filed by Andritz and the claims in that action related solely to the obligations of GMP under its subcontract with Andritz to provide engineering services for design of that portion of the Project involving the dryers and related systems.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: Honolulu, Hawai`i, _____JUN 2 3 2006_____.

_____
WAGDY A. GUIRGUIS