**SAKAI IWANAGA SUTTON**
**LAW GROUP, AAL, LLLC**
RICHARD C. SUTTON JR.  1010-0
Email: dsutton@lava.net
City Financial Tower, Suite 2307
201 Merchant Street
Honolulu, Hawai`i 96813
Tel. No. (808) 792-3888
Fax No. (808) 521-5262

**CASE BIGELOW & LOMBARDI**
A Law Corporation
MICHAEL R. MARSH          1327-0
Email: mmarsh@casebigelow.com
TED N. PETTIT              4287-0
Email: tpettit@casebigelow.com
JOHN D. ZALEWSKI           4718-0
Email: jzalewski@casebigelow.com
Pacific Guardian Center, Mauka Tower
737 Bishop Street, Suite 2600
Honolulu, Hawai`i 96813
Telephone   (808) 547-5400
Facsimile:  (808) 523-1888

Co-Counsel for Defendant
GMP HAWAI`I, INC.

**IN THE UNITED STATES DISTRICT COURT**

**DISTRICT OF HAWAI`I**

| | |
|---|---|
| SYNAGRO TECHNOLOGIES, INC., | CIVIL NO. CV044-00509 (SPK/LEK) |
| Plaintiff, | **DECLARATION OF** |
| vs. | **PETER B. MELNYK** |
| GMP HAWAI`I, INC., | |
| Defendants. | |

Exhibit 6

28130-2/414096

## **DECLARATION OF PETER B. MELNYK**

1. I, PETER B. MELYNK, declare that this Declaration is provided upon personal information and belief and is true to the best of my knowledge.

2. I am the Vice President of GMP HAWAI`I, INC. ("GMP"), a Hawai`i Corporation.

3. I am a professional engineer licensed in Hawai`i and Ohio.

4. I have personal knowledge regarding the facts stated herein, and am competent to testify regarding the same.

5. Sometime in late 1999 or early 2000, the President of GMP, Wagdy Guirguis, informed me that Synagro Technologies, Inc. ("Synagro") was pursuing a contract with the City and County of Honolulu ("City") for design and construction of an In-vessel Bioconversion Facility at the Sand Island Wastewater Treatment Plant in Honolulu (the "Project") and had asked and he had agreed that GMP become a member of Synagro's Project Delivery Team to jointly pursue obtaining the contract for the In-Vessel Bioconversion Facility ("Bioconversion Facility") so that GMP could provide the engineering and construction management services required for design and construction of the Bioconversion

Facility if the City determines that Synagro is qualified and awards it the contract for the Project.

      6.    As a member of the Project Delivery Team, GMP then proceeded to provide the "process engineering" services necessary to develop the optimum engineering concepts for the facility. Based on its knowledge of the characteristics of wastewater at the Sand Island treatment facility, GMP recommended the addition of a digester system to reduce the organic content and to enable conversion of approximately one-half of the sludge to gas that could be used to generate energy to operate the facility and the wastewater treatment plant. That recommendation was a substantial benefit to the Project as it greatly reduced the quantity of processed sludge that would have to be deposited in landfills in the event that a sufficient market for the processed materials could not be found and it provided an alternative energy source for the Bioconversion Facility. Although it had no prior experience with digester systems, Synagro adopted that recommendation because it significantly improved the proposed facility and was strongly supported by the City. The City requested that an egg-shaped digester be used and, as such a digester was only produced by CBI Walker Services, Inc. ("CBI"), Synagro added CBI to the Project Delivery Team. In addition, GMP recommended that an existing incinerator building be utilized for a portion of the Project and, although the City could not implement that modification during the

bidding stage so as not to give an unfair advantage to Synagro and its Project Delivery Team, it did so by change order immediately following award of the contract to Synagro.

7. Working in conjunction with Synagro and the other members of the Project Delivery Team, GMP also prepared preliminary plans for the proposed facility as required by the Invitation for Bids and identified all of the environmental and zoning permits and variances that would be required to develop and operate the facility. Since GMP was the only member of the Project Delivery Team with design capabilities that had worked in Hawaii and was familiar with the zoning and permitting requirements for facilities such as those involved with the Project, GMP was identified as the Project Delivery Team member responsible for environmental assessment and permitting as well as the engineering design and construction management.

8. In conjunction with the other members of the Project Delivery Team, GMP also assisted Synagro in obtaining qualification to submit a price proposal by preparing for and making a presentation to the City regarding the qualifications, experience and roles of the members of the Project Delivery Team with respect to the Project (the "Presentation"). In April of 2001, I flew to Arlington, Texas to meet with the Project Delivery Team members for the purpose of preparing for that Presentation. In May of 2001, representatives of the Project

4

Delivery Team members, including Jim Hecht and Mark Gorwich of Synagro, Peter Cummingford and Steve Huff of Andritz, and John Baer of CBI met in GMP's offices in Honolulu to jointly prepare the Presentation to the City which was required to satisfy the City with regard to the qualifications and experience of the members of the Project Delivery Team who would design and build the Project if the contract was awarded to Synagro. During the course of that Project Delivery Team meeting in GMP's offices, which meeting was led by Jim Hecht of Synagro, the Project Team members further discussed and defined the scope of their respective roles in the Project. The focus of the discussion was to determine what was required for Synagro, through its Project Delivery Team, to be qualified as a bidder and what each member of the Project Team could contribute for that purpose and for the purpose of developing a successful price proposal so that Synagro could obtain the contract for the joint benefit of itself and the Project Delivery Team.

9.  At that same meeting, the Project Delivery Team members also discussed what information to include in the PowerPoint Presentation for the City that would describe their respective roles, qualifications and experience, which presentation was assembled by GMP working under the direction and approval of the Project Delivery Team leader, Jim Hecht of Synagro.

10. A copy of the that PowerPoint Presentation is attached as Exhibit "A" to Synagro's Motion for Summary Judgment and includes the slides relating to GMP's qualifications, experience and participation in the Project that were prepared by GMP working in conjunction with the Project Delivery Team with my direct participation in May 2001, at the request and under the direction of Synagro. As set forth in Exhibit "A", the GMP slides included examples of GMP's extensive experience in wastewater treatment plants including several plants constructed for the City. The GMP slides also describe GMP's scope of work for the Project ("Scope of Work") as including:

   (1) Environmental Assessment & Permitting;

   (2) Engineering Design including architectural, civil, electrical, mechanical, and structural; and

   (3) Construction Management.

GMP was the only Project Delivery Team member identified as providing that scope of work. Additional slides detailed GMP's Project Approach and detailed the Permits required from the State of Hawaii, United States Environmental Protection Agency, and the City. A final slide entitled "Benefits to the City" listed:

- " Extensive experience with Sand Island treatment operations (1980-1995),"

6

- "Intimate knowledge of needs & requirements of Environmental Services, and Design & Construction departments," and

- "Well versed in Federal and State regulatory requirements (25 years of operation in Hawaii)" (*see,* Exhibit "A").

11.  On May 10, 2001, I participated in the qualifying Presentation made by Synagro and the Project Delivery Team to the City, which presentation identified GMP as a member of the "Project Delivery Team." The purpose of the Presentation was to satisfy the requirements of the City procurement process, as established by the request for proposal for the Project, for qualification of Synagro, through its Project Delivery Team members who would design and build the facility if Synagro was allowed to submit a price proposal and was the successful bidder. During the course of that Presentation, the PowerPoint Presentation, including the GMP slides contained in Exhibit "A," was presented to the City.

12.  Following that Presentation, the City determined that Synagro, through its Project Delivery Team, was qualified to perform the design-build services contemplated by the Invitation for Bids and the efforts of the Project Delivery Team were then directed to jointly developing the information necessary for Synagro to prepare and submit a price proposal for design and construction of the Bio-Conversion Facility.

7

13.  In order to determine the costs that would be incurred to design and build the facility, preliminary plans had to be prepared. Pursuant to the request of James Hecht of Synagro, and working under his direction and jointly with the other Project Delivery Team members directly in Honolulu and otherwise, GMP prepared preliminary plans for the facility based on the conceptual design recommended by GMP including the digester systems but not utilizing the existing incinerator building for the dryer systems as required for Hawaiian Dredging to estimate the cost to construct the facility. Consistent with Synagro's agreement that GMP would provide all engineering services required for the Project, those preliminary plans included architectural, civil, electrical, mechanical, and structural design for the Project. Synagro then utilized the construction costs as estimated by Hawaiian Dredging together with the other costs provided by the members of the team, including GMP, to determine the amount of the price proposal that it submitted to the City to design, build and operate the Project.

14.  At the request of Synagro, GMP also submitted engineering fee proposals and construction management proposals for work to be performed by GMP to Andritz in 2001 for its submission to Synagro, which fee proposals GMP later reconfirmed directly to Synagro in 2002. A copy of a July 26, 2002 e-mail from GMP sent on my instruction to James Hecht of Synagro reconfirming the proposed engineering fees for the sludge drying building in the amount of

8

$254,469 and for construction management services in the total amount of $696,231 is attached as Exhibit "R" to Synagro's Motion. When it supplied these and other estimates to Andritz and Synagro, GMP understood that the estimates would be used by Synagro to prepare the Price Proposal that were to be submitted to the City for the design and construction management services that Synagro represented to GMP and the City would be performed by GMP.

15.  Following award of the contract for the Project to Synagro, the members of the Project Delivery Team met again in Honolulu to fine tune the estimates of cost for the Project and to jointly develop the information required for Synagro to prepare and submit a change order adjusting the contract amount to reflect utilization of the existing incinerator building for the Project as recommended by GMP during the process engineering stage. At the request of Synagro, GMP prepared and submitted to the City the 30% complete engineering plans required to depict and price the design revisions associated with that change order. Consistent with Synagro's agreement that GMP would provide all engineering services required for the Project, those 30% plans included architectural, civil, electrical, mechanical and structural designs for the Project.

16.  GMP incurred significant labor costs, overhead, and expenses in connection with contributing process engineering services for the Project, preparing preliminary plans, calculations and data required for the proposal,

preparing for and making in conjunction with the Project Delivery Team the Presentation required to qualify Synagro, through the members of the Project Delivery Team, to design and build the Bio-Conversion Facility, and preparing the preliminary plans required for Hawaiian Dredging to estimate the cost of constructing the facility which Synagro used to develop and submit a price proposal for the Project, none of which costs were billed or reimbursed.

17. GMP also used its valuable reputation, experience, and goodwill on behalf of Synagro in connection with advancing Synagro's proposal, incorporating GMP's process engineering efforts, with the City and in making the Presentation to the City that was necessary to qualify Synagro, through the Project Delivery Team members, to design and build the Bio-Conversion Facility, and has not been compensated for its efforts in that regard.

18. GMP did so because it was told by James Hecht of Synagro, and other representatives from Synagro, that GMP would perform the entire GMP Project Scope of Work, as discussed and agreed at the Project Delivery Team meetings and otherwise and as reflected in the PowerPoint Presentation to the City, Exhibit "A," and it expected to profit from its efforts in connection with the Project by performing that entire scope of work if the efforts of the Project Delivery Team resulted in Synagro being the successful bidder and obtaining the contract to

design and build the Bio-Conversion Facility for the benefit of itself and the other members of the Project Delivery Team.

19. When GMP was providing the services described above, it understood that Andritz would be the Project Manager for Synagro in the event that Synagro was the successful bidder. In fact, Synagro advised GMP that Andritz would act as the Project Manager and directed GMP to submit its fee proposals for the Project to Andritz.

20. In November 2001, Synagro entered into a contract with Andritz, however, rather than being for management of the entire Project as GMP had been advised and understood when it was contributing the services described above, that contract was limited to designing and constructing the portion of the Bioconversion Facility that involves the dryers and related systems. The Synagro-Andritz Contract Price was $20,300,000 and did not require the use of any engineers or subcontractors such as GMP. (*See,* Synagro Exhibit "D").

21. In March 2002, Synagro entered into a separate contract with CBI to design and build the biosolids digester portion of the Bioconversion Facility. The Synagro-CBI Contract Price was $10,415,000 and did not require the use of any engineers or subcontractors such as GMP. (Synagro Exhibit "F").

22. In May 2002, Synagro entered into two contracts with the City: one to design and build and one to operate a Bio-conversion Facility at the Sand

Island Waste Water Treatment Plant ("Operation Contract"). A true and correct copy of the Operation Contract is attached as GMP Exhibit "3". The Operation Contract is for Synagro to operate the Bio-conversion Facility at the Sand Island Waste Water Treatment Plant for thirteen years with an option to renew. The Contract Price for the design-build contract with the City is $33,755,000 ("Design-Build Contract"). (*See,* Synagro Exhibit "C"). The Contract provided a "Drawdown Schedule" as Exhibit J to the Contract and the amount for Phase I for "Initial Design, Permit Preparation and Regulatory Liaison" is $800,000, the amount for Phase II Task 1 "Design Engineering" is $2,575,000, the amount for Phase II Task 2 "Construction and Installation" is $28,016,850, and the amount for Task 3 "Start-Up and Acceptance" is $2,362,850.

23.   On May 9, 2002, the Houston Business Journal (Houston is the headquarters of Synagro) published an article on the award of the Design-Build Contract stating, "**Synagro has teamed up with GMP & (sic) Associates**, Hawaiian Dredging Construction Co., Andritz-Ruthner Inc. and Chicago Bridge & Iron Co. for the design and construction of the facility at Honolulu's Sand Island Wastewater Treatment Plant." (emphasis added). Attached as GMP Exhibit "2" is a true and correct copy of the internet article from the May 9, 2002 Houston Business Journal.

24.  In 2002, GMP entered into a subcontract with Andritz to provide the architectural, civil, electrical, mechanical and structural engineering services required to design and build that portion of the Sand Island Bioconversion Facility that involves the dryers and related systems, as contracted to Andritz by Synagro. (*See,* Synagro Exhibit "G").  GMP has and is continuing to perform all of those design services for that portion of the Project as Synagro agreed and GMP understood it would when it contributed the services described above in furtherance of the Project Delivery Team's joint efforts to secure qualification of Synagro, through the members of the Team, to submit a price proposal and to obtain the Design-Build Contract for the joint benefit of the members of the Project Delivery Team.

25.  On August 19, 2002, GMP entered into a subcontract with CBI to provide the civil engineering services required to design and build the biosolids digester portion of the Bioconversion Facility, that largely excluded the architectural, electrical, mechanical and structural engineering services for that portion of the Bioconversion Facility that involves the biosolids digester systems also contracted to CBI by Synagro. (*See,* Synagro Exhibit "F").  GMP has performed that limited scope of engineering services for the biosolids digester portion of the Project but is not performing any significant architectural, electrical, mechanical or structural engineering services for that portion of the Project as

Synagro agreed and GMP understood it would when it contributed the services described above in furtherance of the Project Delivery Team's joint efforts to secure qualification of Synagro, through the members of the Team, to submit a price proposal and to obtain the Design-Build Contract for the joint benefit of the members of the Project Delivery Team.

26.   GMP has not received a contract from Synagro or a subcontract from either Andritz or CBI to perform construction management services for any portion of the Project despite Synagro's agreement and GMP's understanding that it would perform construction management services for the entire Project, as a Projcect Delivery Team member, when it contributed the services described above in furtherance of the Project Delivery Team's joint efforts to secure qualification of Synagro, through the members of the Team, to submit a price proposal and to obtain the Design-Build Contract for the joint benefit of the members of the Project Delivery Team.

27.   Although GMP accepted the scope of work offered by Andritz and CBI, as described above, GMP never agreed with Synagro that any participant in the Project other than GMP would perform the architectural, electrical, mechanical or structural engineering services required to design and build the bio-solids digester portion of the Project as contracted to CBI by Synagro, or that GMP would not perform construction management services for the entire Project as

specifically discussed and agreed with Synagro prior to GMP performing the services described above. It is the position of GMP that, pursuant to the agreements reached in connection with obtaining qualification of Synagro, through the members of the Project Delivery Team, to design and build the Bio-Conversion Facility and to develop the successful bid for the Project, GMP is entitled to the benefit associated with the full range of professional engineering and construction management services that Synagro agreed and GMP understood, when it contributed the services described above in furtherance of the Project Delivery Team's joint efforts, that GMP would perform if Synagro obtained the contract to design and build the facility.

28.    Contrary to the statement made in the Declaration of Timothy Steinberger that there was a "policy" within the Department of Public Works that would have prohibited GMP from performing construction management services on a project for which it also provided design engineering services, I have never been informed of such a policy and am aware of several projects for the Department in which the design engineer is performing construction management services, including the Effluent Reuse and Wahiawa Reservoir Outfall Adjustment project in which GMP was the design engineer and performed construction management services.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: Honolulu, Hawaii, ___Nov 23, 2005___.

_____
Peter B. Melnyk, PhD.