```
              IN THE UNITED STATES DISTRICT COURT

                   FOR THE DISTRICT OF HAWAI`I

SYNAGRO TECHNOLOGIES,      )
INC.,                      )
                           )
          Plaintiff,       )
                           )
     vs.                   )  CIVIL NO.
                           )
GMP HAWAII, INC.,          )  CV04-00509 SPK LEK
                           )
          Defendant.       )
_____)


          DEPOSITION OF WAGDY A. GUIRGUIS, P.E.


     Taken on behalf of Plaintiff SYNAGRO TECHNOLOGIES,
INC., at the offices of Alston Hunt Floyd & Ing, ASB
Tower, 1001 Bishop Street, 18th Floor, Honolulu,
Hawaii, commencing at 9:04 a.m., Monday, September 19,
2005, pursuant to Notice.




BEFORE:  ELSIE TERADA, CSR NO. 437
         Certified Shorthand Reporter
```

RALPH ROSENBERG COURT REPORTERS
(808)524-2090

EXHIBIT 3

```
 1   APPEARANCES:

 2

 3   For Plaintiff SYNAGRO TECHNOLOGIES, INC.:

 4        MEI-FEI KUO, ESQ.
          Alston Hunt Floyd & Ing
 5        American Savings Bank Tower
          1001 Bishop Street, 18th Floor
 6        Honolulu, Hawaii  96813
          (808) 524-1800
 7
     For Defendant GMP HAWAII, INC.:
 8
          RICHARD C. SUTTON, JR., ESQ.
 9        Sakai Iwanaga Sutton Law Group
          City Financial Tower, Suite 2307
10        201 Merchant Street
          Honolulu, Hawaii  96813-2929
11        (808) 792-3888

12

13   ALSO PRESENT:

14        DANIEL HABIB, ESQ.

15

16

17

18

19

20

21

22

23

24

25
```

INDEX

| | EXAMINATION BY: | PAGE |
|---|---|---|
| | MS. KUO .............................. | 4 |

| | EXHIBITS FOR IDENTIFICATION: | PAGE |
|---|---|---|
| | Plaintiff's | |
| 1 | Plaintiff Synagro Technologies, Inc.'s Second Amended Notice of Taking Continued Deposition Upon Oral Examination Pursuant to Rule 30(b)(6); Exhibit 'A' (8 pages) | 6 |
| 2 | City & County of Honolulu - Sand Island Sewage Treatment Facility, Pro Forma of Debt Service & Facility Depreciation; and various other documents (49 pages) | 13 |
| 3 | Proposed Language; Bates No. A 000732 (1 page) | 77 |
| 4 | Various e-mails and Proposed Language; Bates Nos. A 000729 through A 000732 (4 pages) | 87 |
| 5 | Construction Contract (173 pages) | 106 |
| 6 | Letter dated July 5, 2002, with attachment; Letter dated October 10, 2002; Letter dated April 25, 2003 (4 pages) | 124 |
| 7 | Letter dated June 1, 2001, with attachments; Bates Nos. GMP - 1762 through GMP - 1767 (6 pages) | 173 |
| 8 | Letter dated September 8, 2003, with attachments; Bates Nos. GMP - 1749 through GMP - 1754 (6 pages) | 179 |
| 9 | Contract, with attachments (27 pages) | 211 |
| 10 | Various documents; Bates Nos. GMP - 1492 through GMP - 1495 (4 pages) | 218 |

```
 1      Q    Frank Doyle's boss?
 2      A    Yeah.
 3      Q    Did you ever have any direct contacts with
 4 Mr. Steinberger?
 5      A    Very limited.
 6      Q    Very little, as in what kind of contacts?
 7      A    Very limited regarding that project.  I don't
 8 recall that I talked to him about this project.
 9      Q    You don't recall talking to him?
10      A    No.
11      Q    Okay.  Do you know whether or not anybody
12 else at GMP has talked to him on the project?
13      A    Could be Peter Melnyk, I'm not sure.
14      Q    I wanted to go back to Counterclaim No. 6,
15 Paragraph 6.  Let's cover the counterclaim issues and
16 then we can take a break till this afternoon, when we
17 need to come back.
18      A    Yeah.
19      Q    Specific question is on No. 6, you have here,
20 "Plaintiff was awarded the contract from the City and
21 County of Honolulu based partly on the past work
22 performed by Defendant..." what are you referring to,
23 there?  Are you talking about the past work referenced
24 in the presentation or just generally past work.
25      A    Presentation and then knowledge with us.
```

1   Q   Okay. And then your second sentence is,
2   "...and the understanding that Defendant would be
3   providing engineering design and construction
4   management..." what is that? What's the factual basis
5   of that statement?
6   A   That means that the client will be assured
7   that the quality engineering will be done at a
8   reasonable cost.
9   Q   But you have here that the understanding that
10  Defendant, meaning GMP, would be providing engineering
11  design and construction management, is this statement,
12  are you talking about the City's understanding or just
13  the general understanding?
14  A   The City have qualified Synagro to go to
15  step three of the bidding, after this presentation. So
16  the presentation showed that part of the team is GMP,
17  that have experience and specially on Sand Island.
18  Sand Island with GMP started working there since 1977,
19  and we know every pipeline, every valve. So our
20  knowledge of Sand Island would bring GMP to running
21  there.
22  Q   So when you say here Plaintiff was awarded
23  the contract from the City, based partly on, and then
24  you have understanding that Defendant would be
25  providing engineering designing work, that is based

```
 1   upon one thing -- I mean, I'm still confused, based on
 2   the presentations and the work?
 3        A    Based on the representation of Synagro that
 4   GMP is the engineer for the team.
 5        Q    Okay.  I also wanted to -- hold on a second.
 6   I'd like to next go to the compensation issue.  You
 7   have here, the total design expenses is approximately
 8   2,683,422 for the said contract.  You're talking about
 9   the implied contract, right?
10        MR. SUTTON:  Which contract?
11        MS. KUO:  Well, I'm going by the counterclaim.  He
12   says the total of the design expenses is approximately
13   2,683,422 for the said contract.
14        Q    (BY MS. KUO):  What contract are you
15   referring to?  Right here.
16        A    That's number what?
17        Q    No. 1, Paragraph 12 of the counterclaim
18   that's attached as Exhibit 3 to Melnyk's depo.
19        MR. SUTTON:  You're answering her question on
20   Paragraph 12, as to what contract this is.
21        THE WITNESS:  From what I see right now, it
22   appears to be the implied contract.
23        Q    (BY MS. KUO):  Okay.  And what is this figure
24   based on, the 2 million six hundred eighty-three?
25        A    Yeah.  Based on what they negotiated.
```

```
 1    Q    Excuse me?
 2    A    Based on that design fees.
 3    Q    I'm sorry.  So you're talking about GMP
 4  Document 186, and you're referring to the adjusted
 5  price, second item?
 6    A    Yeah.
 7    Q    That's what it's based on?
 8    A    That is correct.
 9    Q    Okay.  Anything else?
10    A    That's it.
11    Q    And this engineering design work value, the
12  total of it, does that include work that GMP provided
13  under the Andritz and CBI contracts?
14    A    Yes.
15    Q    How much, first of all, has -- what is the
16  contract value of the Andritz-CBI contract -- I mean,
17  the Andritz and GMP contract?
18    A    I don't recall the facts.
19    Q    Okay.
20    A    Peter Melnyk knows the figures, all the
21  figures.
22    Q    Same thing with the CBI, and Peter Melnyk
23  would be the best person for that?
24    A    That's correct.  But I can tell you, it was
25  not $2,683,422.
```

```
 1       Q    And the construction management value here,
 2  again, is that for the implied contract?
 3       A    That is correct.
 4       Q    And how did you get this value?
 5       A    I took the 646- plus the 200- from the
 6  adjusted amount.
 7       Q    Okay. So that includes the 200,000 that was
 8  denied by the City, right?
 9       A    I'm not sure because it appeared to me that
10  this is adjusted value, it appeared to me -- I have to
11  the look the contract. It's 3, 3-9-7-8, then that one
12  is it. Sometimes they denied, sometimes they included,
13  so we would have to look at the figure, find the figure
14  of the contract.
15       Q    So you're getting that amount from here?
16       A    Yeah, from the adjusted value, from the same,
17  GMP 1086.
18       Q    And that includes the $200,000; correct?
19       A    That is correct.
20       Q    That was in the initial change order, the
21  July --
22       A    -- 27 or whatever it is.
23       Q    Yeah. The amount that's included in this
24  change order here, the January 2nd -- sorry, the
25  January 27, 2003?
```

1    A    Yes.

2    Q    And this figure was eventually denied by the
3  City; isn't that correct?

4    A    I'm not sure.  I have to look at the number
5  here, you see that number match the final contract or
6  not.

7    Q    Okay.

8    MR. SUTTON:  It doesn't say.

9    THE WITNESS:  What's the total?  The final number
10 will say if it matched the adjusted value, because when
11 you say adjusted value, from what I understand, this
12 came from the contract, from the -- where is the one
13 you were looking at here?

14   Q    (BY MS. KUO):  Right here.  The main
15 contract?

16   A    Yeah.

17   MR. SUTTON:  There is no schedule.

18   THE WITNESS:  This one?

19   MR. SUTTON:  Yeah.

20   MS. KUO:  There's a schedule, but it doesn't break
21 it down.

22   MR. SUTTON:  It doesn't break it down.  There is
23 no schedule on that.

24   THE WITNESS:  So where this one came from?

25   MR. SUTTON:  That's --

1       THE WITNESS:  Yeah.  Because it say adjusted
2  value, that means this is the final number, okay?
3       Q    (BY MS. KUO):  Okay.
4       A    So that's the adjusted value, the value
5  number, so the 200 must be in it.  Although there is
6  some reference that it's not been approved, that
7  doesn't mean sometimes it was not included, so we have
8  to look at this number here first and what's the final
9  number of the contract.
10      Q    Okay.  And I want to take your attention back
11 to Exhibit 5.  You have here the figures that support
12 your breakdown for the construction management
13 proposal, right?
14      A    Yes.
15      Q    Okay.  And this first figure, the 427,069,
16 can you describe for me again what that's taken from?
17      A    This is for the engineer from the proposed
18 construction value from the RFP.
19      Q    So that this figure is from the RFP?
20      A    Yeah, from the RFP, the estimated
21 construction, yes.
22      Q    I'm sorry, one more time.  The 427,000 is
23 from the RFP based on, you said the estimated time?
24 I'm confused on that.  Can you describe -- I'm sorry to
25 make you go through it, but I'm a little confused.  So

1  this amount is from where again?
2     A   This is the monthly payment of engineer times
3  the period of time required to build the plant,
4  according to the RFP.
5     Q   Oh, okay. Okay. And then the monthly amount
6  that's paid to a resident engineer, how is that figure
7  obtained?
8     A   Based on his salary, actual salary, the
9  approved overhead and profit, plus the 4.17 percent
10 tax.
11    Q   So the actual salary of a full-time resident
12 engineer, is that pretty standard across the board?
13    A   It depends on the experience. For the
14 smaller job, you need less experienced engineer. For
15 the bigger job, you get bigger experienced engineer,
16 but within the standards of the City.
17    Q   Okay. So the resident engineer here, you
18 have -- to meet a standard of the City, they're on a
19 certain project, their salary would be about pretty
20 similar across the board?
21    A   According to the industry, this is standard.
22    Q   It's according to industry? Okay. And what
23 about the second figure, the 108,863, what is that
24 based on?
25    A   The price of an inspector.

1    Q    Again, multiplying according to the --
2    A    The hourly rate, overhead profits.
3    Q    Okay. And then the hourly rate for the
4  inspector, is that also something that's pretty
5  standard across the board?
6    A    That is correct.
7    Q    And then the last one here, you used the same
8  thing. It's a full-time inspector for construction of
9  digester? So you guys broke it up, then, the sludge
10 versus the digester?
11   A    That is correct.
12   Q    Is this figure obtained the same way where
13 you get the hourly rate multiplied by --
14   A    That is correct, but you can see that we put
15 much more skilled inspector for the digester than the
16 dryer.
17   Q    That's why it's a little higher?
18   A    That is correct.
19   Q    And is there a reason why the inspector is
20 higher for the digester?
21   A    It's much more complex.
22   Q    And the hourly that you were providing the
23 inspector that you get this figure from, is that also
24 pretty standard across the board as well?
25   A    Yeah. It's within the industry standard.

```
 1    Q    So all of these figures are based on industry
 2  standards?
 3    A    That is correct.
 4    Q    Just two more things I want to cover with the
 5  claim and then you can go.  We can come back and
 6  continue in the afternoon.
 7    A    Sure.
 8    Q    You have in here, on Paragraph 14, that:  As
 9  a result, Defendant is entitled to damages including
10  profits from the contract plus costs.
11         What are you talking about profits?
12    A    Profits of the engineering and the
13  construction management.
14    Q    So it's basically these figures here?
15    A    That is correct.
16    Q    Not an additional profit, right?
17    A    That's the profit for this project.
18    Q    And the last thing was, you also have a
19  Count II here, for punitive damage, what's the basis pf
20  this claim here?
21    A    Where is that?  I think this is a legal --
22    MR. SUTTON:  You can give the factual basis for
23  it.
24    THE WITNESS:  So what's the question?
25    Q    (BY MS. KUO):  My question is, what's the
```

```
 1   factual basis of this punitive damages count that you
 2   have there, No. 2?
 3        A    Is because of the breach of contract.
 4        Q    Breach of the implied contract?
 5        A    That is correct.
 6        Q    Okay.
 7        MS. KUO:  That's all the questions I have now.
 8   We'll continue this afternoon.
 9             (Session was resumed at 4:05 p.m.)
10        Q    (BY MS. KUO):  Mr. Guirguis, you understand
11   that you are still under oath?
12        A    I do.
13        Q    Okay.  I wanted to go through what's marked
14   as Exhibit 2.  These are documents that you mentioned
15   that you had reviewed for preparing for today's
16   deposition; is that correct?
17        A    Yes.
18        Q    Are there any other documents that you
19   reviewed other than those that are attached as
20   Exhibit 2?
21        A    No.
22        Q    No, okay.  I did want to go through a couple
23   of these with you to get more information.  This first
24   document here, which is in the gray binder, what is the
25   date of this document?
```

```
 1                    C E R T I F I C A T E

 2   STATE OF HAWAII            )
                                ) SS.
 3   CITY AND COUNTY OF HONOLULU)

 4

 5          I, ELSIE TERADA, do hereby certify;

 6          That on September 19, 2005, at 9:04 a.m.

 7   appeared before me WAGDY A. GUIRGUIS, P.E., the witness

 8   whose deposition is contained herein; that prior to

 9   being examined he was by me duly sworn;

10          That the deposition was taken down by me in

11   machine shorthand and was thereafter reduced to

12   typewritten form under my supervision; that the

13   foregoing represents, to the best of my ability, a true

14   and correct transcript of the proceedings had in the

15   foregoing matter.

16          I further certify that I am not attorney

17   for any of the parties hereto, nor in any way concerned

18   with the cause.

19          DATED this 30th day of September, 2005, in

20   Honolulu, Hawaii.

21

22

23   _____

24   ELSIE TERADA, CSR NO. 437
     Notary Public, State of Hawaii
25   My Commission Expires: 4-07-2006
```