```
1              IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF HAWAI`I

3   SYNAGRO TECHNOLOGIES,        )
                                 )
4   INC.,                        )
                                 )
5            Plaintiff,          )
                                 )
6        vs.                     ) CIVIL NO.
                                 )
7   GMP HAWAII, INC.,            ) CV04-00509 SPK LEK
                                 )
8            Defendant.          )
    _____)

9

10

11        DEPOSITION OF WAGDY A. GUIRGUIS, P.E.

12

13       Taken on behalf of Plaintiff SYNAGRO TECHNOLOGIES,

14  INC., at the offices of Alston Hunt Floyd & Ing, ASB

15  Tower, 1001 Bishop Street, 18th Floor, Honolulu,

16  Hawaii, commencing at 9:04 a.m., Monday, September 19,

17  2005, pursuant to Notice.

18

19

20

21

22

23

24  BEFORE:  ELSIE TERADA, CSR NO. 437    EXHIBIT 7

25          Certified Shorthand Reporter
```

RALPH ROSENBERG COURT REPORTERS
(808)524-2090

```
 1   APPEARANCES:

 2


 3   For Plaintiff SYNAGRO TECHNOLOGIES, INC.:

 4         MEI-FEI KUO, ESQ.
           Alston Hunt Floyd & Ing
 5         American Savings Bank Tower
           1001 Bishop Street, 18th Floor
 6         Honolulu, Hawaii  96813
           (808) 524-1800
 7
     For Defendant GMP HAWAII, INC.:
 8
           RICHARD C. SUTTON, JR., ESQ.
 9         Sakai Iwanaga Sutton Law Group
           City Financial Tower, Suite 2307
10         201 Merchant Street
           Honolulu, Hawaii  96813-2929
11         (808) 792-3888

12


13   ALSO PRESENT:

14         DANIEL HABIB, ESQ.

15

16

17

18

19

20

21

22

23

24

25
```

1   Q   (BY MS. KUO): So after reviewing the
2   counterclaim and having a discussion with your
3   attorney, do you have some knowledge to discuss the
4   factual basis of GMP's claims related to No. 11; is
5   that correct?
6   A   Is 11 is like that?
7   Q   11 is the counterclaim, GMP's claim.
8   MR. SUTTON: That's here (indicating).
9   THE WITNESS: Yeah. The factual.
10  MR. SUTTON: Right.
11  MS. KUO: Yes.
12  MR. SUTTON: This is for the counterclaim. This
13  is the document we just looked at. You know about
14  that.
15  THE WITNESS: Yeah, but what's stated?
16  MR. SUTTON: That's having to do with the defenses
17  asserted.
18  THE WITNESS: So, yeah, I know 11, and then we can
19  basically revisit 10, if we have to.
20  Q   (BY MS. KUO): Okay. What have you done to
21  prepare for the deposition today?
22  A   Actually, very little.
23  Q   Okay.
24  A   Yeah.
25  Q   Did you meet with your counsel?

1    A    Yes, I did.
2    Q    And how long was your meeting with your
3    counsel?
4    A    This morning, actually.
5    Q    Over an hour?
6    A    Oh, less than that.
7    Q    Did you talk to Mr. Melnyk at all about his
8    prior testimony in the case before this deposition?
9    A    Mr. Melnyk is out of town.
10   Q    That doesn't answer my question though.  Did
11   you talk to Mr. Melnyk, before he went out of town, on
12   his testimony in this case?
13   A    Basically, he didn't brief me on the details.
14   He said that he was supposed to be deposed on the
15   Thursday, that he was not deposed.
16   Q    So he did not brief you on any details?
17   A    No.
18   Q    No discussion with him on it?
19   A    No discussion with him, yeah.
20   Q    Did you review Mr. Melnyk's deposition
21   testimony before your deposition today?
22   A    No.
23   Q    Did you meet with any other staff members at
24   GMP about this case before your deposition?
25   A    No.

```
 1      A    This is not verbatim, ma'am.  This is not
 2  verbatim.  This is the process of putting a team of
 3  proposal.  I don't remember anything specific
 4  conversation.  We have tons of meetings.
 5      Q    Right.  Well, how many meetings occurred
 6  between that year, within that year?
 7      A    I don't recall, but every time Jim Hecht
 8  comes here, we were always involved into the meeting,
 9  and after that, I follow up with meeting with the city
10  employee, and was Don Clegg.
11      Q    Uh-huh.
12      A    Because there were lots of issues unclear.
13      Q    So with Jim Hecht specifically, were there
14  any statements made by Jim on GMP's involvement in this
15  project?
16      A    Yes.  He would like to have us as the
17  engineer design and the construction management.
18      Q    And did you have any specific discussions
19  with him on what the engineering work would be?
20      A    Of the project?
21      Q    Yes.
22      A    The entire project.
23      Q    The entire project?
24      A    Entire project.
25      Q    Anything specific said, though, in terms of
```

1  this is the engineering work that you're going to be
2  doing?
3      A   The equipment supplier provides black boxes,
4  which they process, which we don't engineer.  We take
5  them all, and we put them into the treatment plants and
6  to make it work.
7      Q   I guess that doesn't answer my question,
8  though.  Did he ever say anything specific about this
9  is the type of engineering work that GMP is going to
10 perform?
11     A   That what the engineering did, that the
12 presentation implied that we take that black boxes, we
13 connect them together.  Because these people have
14 equipment.  They have systems.  They have processes.
15 And that what they are selling.
16     Q   Can you show me in the slides what you're
17 referring to, when you say that it's implied in there,
18 that the work encompasses all engineering design work?
19     A   Project Team (indicating).
20     Q   Okay.  And just for reference -- actually,
21 I'm sorry, can we take a break because I don't think I
22 have this copy here.
23     A   You can use this one, if you want.
24     MR. SUTTON:  It's in Melnyk's deposition, it's
25 Exhibit 6.  Let's refer to that one.

1  how much you're going to be -- you know, the drawings,
2  this is what you're providing, anything specific in
3  those terms with Synagro?
4       A    We have several, a few proposal that evolved
5  later on, which Dr. Melnyk gave that. You have some of
6  these documents, okay?
7       Q    Yes. My understanding from Peter Melnyk is
8  those proposals were eventually submitted to Andritz
9  and CBI for work that GMP then performed; is that
10 correct?
11      A    What we -- at that time, Andritz was going to
12 be the project manager for Synagro, and they asked us
13 to submit fee proposal to Andritz for all the work.
14 But that, before, we were able to bring CBI Walker,
15 because the process of digestion will improve the
16 performance of the product. So now we get two subs,
17 major subs that Synagro became very leary of handling
18 and Andritz refused to handle CBI Walker. So that's
19 how they told us to work with both sides.
20      Q    So Synagro did tell you to contract Andritz
21 and CBI for work on the project; is that correct?
22      A    That is basically how it -- it came after
23 that. CBI Walker decided to do their own engineering.
24 Andritz gave us some engineering. So after we agreed
25 to all that and we brought Andritz, CBI Walker to the

1   table, because that would enhance the project, all of a
2   sudden Synagro washing their hands from earlier
3   commitment, so that we cannot take liability from these
4   people. This is the first time to work with them.
5   That's your problem.
6       Q   What do you mean by earlier commitment? I'm
7   trying to tie down what commitment you're saying.
8       A   The earlier commitment that we're going to be
9   doing the design and the CM for the entire project.
10      Q   But nothing specific discussed other than
11  you'll be doing the engineering design and CM work?
12      A   Ma'am, you have to understand the engineering
13  process. When you go and build a sewage treatment
14  plant, we don't design the pumps that the equipment
15  supplies bring. We don't design the air vents. These
16  are all from catalogs.
17      Q   So why is it, then, that when you look at the
18  Andritz contract, for example, and I'll show it to you,
19  it's marked Exhibit 9 to Peter Melnyk -- it's Andritz
20  and GMP contract; is that correct?
21      A   Right.
22      Q   If you look at the scope of work, it is
23  detailed in here what design is going to be done by
24  GMP.
25      A   That is correct.

1   Q   Okay. And so the inclusion of -- and have
2  you had a chance yet to read Exhibit 15?
3   A   Uh-huh.
4   Q   Exhibit 15 is an accurate copy of Change
5  Order 1. Have you seen this document before today?
6   A   Long time ago, but I have seen it, yes.
7   Q   Okay. I want to take your attention to the
8  attachment that's on GMP - 184. Do you see the
9  reference here to 200,000, and it says, "Additional
10 construction management services by GMP"? Right here
11 (indicating).
12  A   Yes.
13  Q   Okay. This insertion here, who had put that
14 in? At whose request was that included in this change
15 order?
16  A   I have no idea, but this internal work by
17 Synagro.
18  Q   Okay. How did they arrive at the $200,000
19 amount?
20  A   From my recollection, they had 4-, 500,000
21 available initially, to start with. Was how much?
22 600,000.
23   MR. SUTTON: (Indicating.)
24   THE WITNESS: Construction management.
25   MR. SUTTON: Yes.

```
 1        THE WITNESS:  600,000.
 2        MR. SUTTON:  6460.
 3        THE WITNESS:  646- initially.
 4        MS. KUO:  Uh-huh.
 5        THE WITNESS:  And we said that's not enough
 6   because our fee proposal was much higher than that, so
 7   they added 200,000 more.
 8        Q    (BY MS. KUO):  Okay.  And so that's how that
 9   figure, your understanding?
10        A    Yeah.
11        Q    So this document here, this change order,
12   this is not a final document.  It still needs to be
13   approved by the City; correct?
14        A    That is correct.
15        Q    And do you have any understanding of whether
16   or not this additional amount for 200,000 for
17   construction management was ever approved by the city?
18        A    I have no idea.
19        Q    Okay.  I want to show you Exhibit 16 to Peter
20   Melnyk's deposition.
21        A    Uh-huh.
22        Q    And if you look at, this is an e-mail, a
23   June 5th e-mail from the city, Steven Serikaku, to
24   Connie Reynolds and Jim Hecht of Synagro.  And if you
25   go down towards the middle, it states, "We also provide
```

1  the following comments: The $200,000 cost for
2  additional management shall be deleted."
3         Do you see that?
4  A    Yes.
5  Q    So, did you ever receive any type of
6  appropriation from the city to provide construction
7  management work?
8  A    We don't work for the city. We don't work
9  for the city. We work for Synagro.
10 Q    Okay. Did you ever receive any type of -- on
11 construction management, what were the terms that were
12 discussed between Synagro and GMP?
13 A    We have submitted our fee proposal, was an
14 excess of 700,000.
15 Q    Let me show you Exhibit No. 5. Is this what
16 you are calling your, quote-unquote, fee proposal?
17     MR. SUTTON: Exhibit 5 is document GMP - 0176.
18     THE WITNESS: Yes, and that's the portion of the
19 construction management, if you add the 400- plus the
20 300-, that comes to over the 700,000.
21 Q    (BY MS. KUO): Okay. I want to show you
22 here, though, it says: Peter Melnyk asked me to e-mail
23 you the following regarding your engineering fee
24 proposal. And later on down here, it says: Under
25 construction management GMP proposes.

1  upon one thing -- I mean, I'm still confused, based on
2  the presentations and the work?
3      A    Based on the representation of Synagro that
4  GMP is the engineer for the team.
5      Q    Okay.  I also wanted to -- hold on a second.
6  I'd like to next go to the compensation issue.  You
7  have here, the total design expenses is approximately
8  2,683,422 for the said contract.  You're talking about
9  the implied contract, right?
10     MR. SUTTON:  Which contract?
11     MS. KUO:  Well, I'm going by the counterclaim.  He
12 says the total of the design expenses is approximately
13 2,683,422 for the said contract.
14     Q    (BY MS. KUO):  What contract are you
15 referring to?  Right here.
16     A    That's number what?
17     Q    No. 1, Paragraph 12 of the counterclaim
18 that's attached as Exhibit 3 to Melnyk's depo.
19     MR. SUTTON:  You're answering her question on
20 Paragraph 12, as to what contract this is.
21     THE WITNESS:  From what I see right now, it
22 appears to be the implied contract.
23     Q    (BY MS. KUO):  Okay.  And what is this figure
24 based on, the 2 million six hundred eighty-three?
25     A    Yeah.  Based on what they negotiated.

```
 1      Q    Excuse me?
 2      A    Based on that design fees.
 3      Q    I'm sorry.  So you're talking about GMP
 4   Document 186, and you're referring to the adjusted
 5   price, second item?
 6      A    Yeah.
 7      Q    That's what it's based on?
 8      A    That is correct.
 9      Q    Okay.  Anything else?
10      A    That's it.
11      Q    And this engineering design work value, the
12   total of it, does that include work that GMP provided
13   under the Andritz and CBI contracts?
14      A    Yes.
15      Q    How much, first of all, has -- what is the
16   contract value of the Andritz-CBI contract -- I mean,
17   the Andritz and GMP contract?
18      A    I don't recall the facts.
19      Q    Okay.
20      A    Peter Melnyk knows the figures, all the
21   figures.
22      Q    Same thing with the CBI, and Peter Melnyk
23   would be the best person for that?
24      A    That's correct.  But I can tell you, it was
25   not $2,683,422.
```

1    Q    And the construction management value here,
2    again, is that for the implied contract?
3    A    That is correct.
4    Q    And how did you get this value?
5    A    I took the 646- plus the 200- from the
6    adjusted amount.
7    Q    Okay. So that includes the 200,000 that was
8    denied by the City, right?
9    A    I'm not sure because it appeared to me that
10   this is adjusted value, it appeared to me -- I have to
11   the look the contract. It's 3, 3-9-7-8, then that one
12   is it. Sometimes they denied, sometimes they included,
13   so we would have to look at the figure, find the figure
14   of the contract.
15   Q    So you're getting that amount from here?
16   A    Yeah, from the adjusted value, from the same,
17   GMP 1086.
18   Q    And that includes the $200,000; correct?
19   A    That is correct.
20   Q    That was in the initial change order, the
21   July --
22   A    -- 27 or whatever it is.
23   Q    Yeah. The amount that's included in this
24   change order here, the January 2nd -- sorry, the
25   January 27, 2003?

1   A    Yes.

2   Q    And this figure was eventually denied by the
3  City; isn't that correct?

4   A    I'm not sure.  I have to look at the number
5  here, you see that number match the final contract or
6  not.

7   Q    Okay.

8       MR. SUTTON:  It doesn't say.

9       THE WITNESS:  What's the total?  The final number
10  will say if it matched the adjusted value, because when
11  you say adjusted value, from what I understand, this
12  came from the contract, from the -- where is the one
13  you were looking at here?

14   Q    (BY MS. KUO):  Right here.  The main
15  contract?

16   A    Yeah.

17       MR. SUTTON:  There is no schedule.

18       THE WITNESS:  This one?

19       MR. SUTTON:  Yeah.

20       MS. KUO:  There's a schedule, but it doesn't break
21  it down.

22       MR. SUTTON:  It doesn't break it down.  There is
23  no schedule on that.

24       THE WITNESS:  So where this one came from?

25       MR. SUTTON:  That's --

1  Q   So all of these figures are based on industry
2  standards?
3  A   That is correct.
4  Q   Just two more things I want to cover with the
5  claim and then you can go.  We can come back and
6  continue in the afternoon.
7  A   Sure.
8  Q   You have in here, on Paragraph 14, that:  As
9  a result, Defendant is entitled to damages including
10 profits from the contract plus costs.
11     What are you talking about profits?
12 A   Profits of the engineering and the
13 construction management.
14 Q   So it's basically these figures here?
15 A   That is correct.
16 Q   Not an additional profit, right?
17 A   That's the profit for this project.
18 Q   And the last thing was, you also have a
19 Count II here, for punitive damage, what's the basis pf
20 this claim here?
21 A   Where is that?  I think this is a legal --
22 MR. SUTTON:  You can give the factual basis for
23 it.
24 THE WITNESS:  So what's the question?
25 Q   (BY MS. KUO):  My question is, what's the

```
 1                C E R T I F I C A T E
 2   STATE OF HAWAII            )
                                ) SS.
 3   CITY AND COUNTY OF HONOLULU)
 4
 5         I, ELSIE TERADA, do hereby certify;
 6         That on September 19, 2005, at 9:04 a.m.
 7   appeared before me WAGDY A. GUIRGUIS, P.E., the witness
 8   whose deposition is contained herein; that prior to
 9   being examined he was by me duly sworn;
10         That the deposition was taken down by me in
11   machine shorthand and was thereafter reduced to
12   typewritten form under my supervision; that the
13   foregoing represents, to the best of my ability, a true
14   and correct transcript of the proceedings had in the
15   foregoing matter.
16         I further certify that I am not attorney
17   for any of the parties hereto, nor in any way concerned
18   with the cause.
19         DATED this 30th day of September, 2005, in
20   Honolulu, Hawaii.
21
22
23   _____
24   ELSIE TERADA, CSR NO. 437
     Notary Public, State of Hawaii
25   My Commission Expires: 4-07-2006
```